## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| _____ ) | |
| PG PUBLISHING COMPANY, and ) | |
| BLOCK COMMUNICATIONS, INC. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No.   2:20-cv-1222 |
| ) | |
| PITTSBURGH COMMISSION ON ) | |
| HUMAN RELATIONS ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This civil rights action by the publisher of the Pittsburgh Post-Gazette ("Post-Gazette"), PG Publishing Company, and its parent company, Block Communications, Inc. ("BCI"), brought under 42 U.S.C. § 1983, seeks declaratory and injunctive relief against the efforts of the Pittsburgh Commission on Human Relations ("Commission" or "PCHR") to impose governmental supervision and control over a newspaper's ability to maintain standards of journalistic integrity and ethics.  It arises from a June 9, 2020, Complaint the Commission brought against the Post-Gazette ("Complaint") for applying its editorial policy that news reporters should not cover events about which they have engaged in public commentary.  *See* Exhibit 1.  The Complaint purports to raise questions of racial discrimination because the reporter who initially sparked the controversy is African-American, but the facts show – as even the PCHR acknowledges – that the policy was applied to all Post-Gazette staff members without regard to race.

1

2.     The controversy that led to the Complaint was fueled, in large part, by participants in a labor dispute with the newspaper who sought to exploit the situation by trying to manufacture proof that the Post-Gazette was engaged in discriminatory conduct.  But that plan backfired – and proved just the opposite – because the newspaper insisted that *all* members of its staff adhere to standards of journalistic integrity, and applied its policies equally across the board.  Even after being apprised of these facts, however, the Commission confirmed it plans to investigate the Post-Gazette's exercise of journalistic judgment.

3.     This inquiry is illegitimate and unconstitutional as a gross violation of the Post-Gazette's First Amendment rights.  A newspaper's decision about what stories to cover, which reporters to assign, and how to edit those stories are matters of editorial judgment protected by the free press provisions of the United States and Pennsylvania Constitutions and are not subject to the Commission's regulatory authority.  The Supreme Court has made clear that these First Amendment guarantees have "no more certain antithesis" than to allow the government to intrude on editorial decisions, even where the state asserts its goal is to enforce anti-discrimination statutes.  *Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 578-79 (1995).

4.     The First Amendment fully protects "the exercise of editorial control and judgment," including the "choice of material to go into a newspaper, … the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair."  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  It likewise protects a newspaper's decision to adopt standards of journalistic integrity, *Newspaper Guild of Greater Phila., Local No. 10 v. NLRB*, 636 F.2d 550 (D.C. Cir. 1980), and its ability to make staff assignments on that basis.  *McDermott v. Ampersand Publ'g LLC*, 593

F.3d 950, 962 (9th Cir. 2010).  The Commission's inquiry is therefore illegitimate and must be enjoined.

## PARTIES

5.      Plaintiff PG Publishing Company, publisher of the Pittsburgh Post-Gazette, is a corporation organized and existing under the laws of the state of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

6.      Plaintiff Block Communications, Inc., is a corporation, organized and existing under the laws of the state of Ohio, with its principal place of business in Toledo, Ohio. Although BCI is the parent company of the Post-Gazette, BCI does not itself do business in Pennsylvania and is not the employer of Post-Gazette employees.

7.      Defendant Pittsburgh Commission on Human Relations is a law enforcement agency that derives its authority from the City Fair Practices Provisions found in Article V, Chapters 651 through 659 of the Pittsburgh City Code, with its principal place of business in Pittsburgh, Pennsylvania.

## JURISDICTION AND VENUE

8.      This Court has original subject matter jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343 because of the existence of federal questions arising under the First Amendment to the United States Constitution.

9.      This Court has authority to issue the requested injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.

10.      This Court has authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendant resides in this District and the events giving rise to this action occurred in this District.

**FACTUAL ALLEGATIONS**

**A.      Post-Gazette Reporter Engages in a Social Media Debate About the George Floyd Protests in Pittsburgh, Which She Then Asks to Cover**

12.     On Saturday afternoon, May 30, 2020, a peaceful protest in downtown Pittsburgh involving more than 3,000 participants mourning the death of George Floyd turned violent, resulting in injuries, looting and burning of police cars.  More than 60 businesses were damaged, and two KDKA-TV journalists were seriously injured when protesters stomped and kicked them, and destroyed their camera.  Just before midnight that day, Pennsylvania Governor Tom Wolf issued an emergency disaster declaration in response to violent clashes in Pittsburgh, Harrisburg, and Philadelphia.  *Gov. Wolf: Commonwealth Response Coordination Center Activated in Response to Riots*, May 30, 2020 (https://www.governor.pa.gov/newsroom/gov-wolf-commonwealth-response-coordination-center-activated-in-response-to-protests/).

13.     The following day, Alexis Johnson, a social media reporter for the Post-Gazette, sent out a tweet likening the damage and destruction caused by the rioters on Saturday with the litter left in parking lots by attendees at a Kenny Chesney country music show.  The tweet contained four photographs of trash-littered parking lots and made light of the widespread destruction in downtown Pittsburgh:



14.     Although Johnson's tweet was sent on her personal Twitter account, it identified her by name, listed the Post-Gazette as her employer, and specified her social media beat as a reporter for the Post-Gazette.

15.     The tweet went viral (being re-tweeted by tens of thousands of Twitter users) and sparked significant debate on the comment thread, some of it quite heated.  Some commentators passionately supported Johnson's tweet; others opposed it with equal vigor.

16.     Johnson participated in the back-and-forth, tweeting in response to one comment: "It's 'just trash and beer cans' that the city has to clean up and people leave behind because of a concert and not because people are outraged with systematic racism and police brutality.  Your privilege is showing."

17.     Karen Kane, the Post-Gazette's Managing Editor, became aware of the Twitter discussion on May 31, and noticed that Johnson had engaged in the ensuing debate.  Kane also saw that one of the comments made in response to the Johnson tweet was a clapping hands emoji posted by Joshua Axelrod, a Post-Gazette sports copy desk editor.

18.     Kane spoke to City Editor Tim McDonough and Deputy Managing Editor for Digital News Matt Kennedy about the Twitter activity after they arrived at the newsroom on June 1, 2020.  She was concerned that Post-Gazette employees had expressed opinions on issues

the newspaper was covering.  As a matter of standard journalistic practice and Post-Gazette editorial policy, Kane believed reporters should not opine on an issue and then report on it, and that Johnson's engagement in the extended Twitter conversation could affect her credibility and the perception of the newspaper's objectivity.  She also felt Johnson's safety could be at risk after a viral tweet in which she was identified with the Post-Gazette, given the violence visited upon the two KDKA-TV reporters on Saturday, the day of the rioting and looting.  Kennedy and McDonough agreed that Johnson should not be assigned to any protest coverage that day.

19.    Johnson had not previously been assigned to any demonstration-related stories. On the morning of June 1, however, Johnson had pitched a few protest-related story ideas in an email to McDonough.  In light of his conversation with Kane and Kennedy about the Post-Gazette's editorial standards and Johnson's activity on Twitter, McDonough responded that Johnson should hold off until they had a chance to talk.

20.    That same day Tyler Batiste, Assistant Managing Editor for Sports, contacted Joshua Axelrod (who had posted the clapping hands emoji on Johnson's Twitter feed) and reminded him that he should not to express personal opinions on social media regarding subjects covered by the Post-Gazette.

**B.    Basic Journalistic Standards Require That Reporters Maintain Independence From Those They Cover**

21.    The Post-Gazette's assignment decisions were grounded in established journalistic principles.  One of the cannons of professional journalism is that reporters must maintain independence from those they cover.  The Society of Professional Journalists ("SPJ") Code of Ethics, sets forth basic tenets of journalism and states that journalists should act independently and "[a]void conflicts of interest, real or perceived."  The SPJ's Ethics Committee has expanded on this point, observing that for "[r]eporters covering politics … almost no

political activity is OK. … For political reporters, yard signs, bumper stickers and even campaign buttons should be considered off-limits. For a broader range of journalists — whether they're covering politics or not — political activism should be avoided." *See* Exhibit 2.

22.     Consistent with the efforts of groups like SPJ to define professional standards of journalism, the Committee of Concerned Journalists along with the Project for Excellence in Journalism conducted a multi-year study to distill the core principles that define the profession, both as taught in journalism schools and practiced in newsrooms across the United States. The results were published in the classic work, THE ELEMENTS OF JOURNALISM, now in its third edition. *See* Bill Kovach and Tom Rosenstiel, THE ELEMENTS OF JOURNALISM (New York: Three Rivers Press, 3d ed., 2014). It explains the reason underlying the need for journalists to maintain independence: "One might imagine that one could both report on events and be a participant in them, but the reality is that being a participant clouds all the other tasks a journalist must perform. It becomes difficult to see things from other perspectives. It becomes more difficult to win the trust of the sources and combatants on different sides." *Id*. at 143.

23.     Maintaining basic journalistic standards is essential to a news organization's credibility, and this is particularly important in an environment where some criticize mainstream news organizations as presenting "fake news." Opinion polls consistently confirm that the public prefers and expects news to be provided by professionals who are not perceived as taking sides. For example, a Pew Research Center Study found that 64 percent of respondents prefer getting news from sources that do not express a political point of view, and that this finding has been consistent for the past two decades. This desire is even more pronounced for online news content, where 74 percent of respondents want news from impartial sources.

C.      **The Post-Gazette's Social Media Guidelines**

24.      Breaches of professional standards can have serious consequences, both for the news organizations and for the reporters who choose to opine on controversial issues. Therefore, in an effort to address how to maintain journalistic integrity at a time when reporters may communicate directly with the public in myriad ways, the Post-Gazette, like most major news organizations, adopted a social media policy to govern such communications. First promulgated in March 2018, the Post-Gazette's Interim Social Media Guidelines for the Newsroom ("Social Media Guidelines") articulate the time-honored principles of journalistic ethics and restate pre-existing norms of the journalistic profession. *See* Exhibit 3.

25.      The Post-Gazette's Social Media Guidelines provide in relevant part:

   a.   "Sharing your personal opinions as well as expressing partisan political views, whether on a personal social media platform or otherwise, might open the employer up to criticism that you are biased and therefore could make you ineligible to cover that particular topic in the future. Be mindful of the integrity, reputation and credibility of the Post-Gazette."

   b.   "Think before you post," and "Don't engage in impolite back and forth exchanges with those who might challenge your work no matter how rude or provocative they might seem."

26.      The policies and standards contained in the Social Media Guidelines are consistent with those used by other major media organizations, including the Associated Press, *Washington Post*, and *New York Times*.

27.      On the morning of June 1, Kane distributed to all staff a copy of the Post-Gazette's Social Media Guidelines because she believed the activity on Twitter over the

weekend, plus the arrival of interns that day, made it a "teachable moment" to remind staff about standard journalistic practices.

28.     It is neither controversial nor uncommon for news organizations to educate, counsel, discipline, and even discharge reporters or other employees who use social media in ways that may affect the credibility of the news organization.

> **D.     The Post-Gazette Declined to Assign Reporters Who Engaged in Social Media Commentary to Cover the Protests, Consistent with its Social Media Guidelines and Established Journalistic Ethics**

29.     Early in the afternoon of June 1, 2020, Kane, Kennedy and McDonough called Johnson to respond to her request for protest-related assignments and to make sure she understood the Post-Gazette's editorial policy.  Kane told Johnson she could not be assigned to protest coverage that day because of the general understanding that reporters should not cover events about which they had publicly expressed opinions.

30.     McDonough added that a basic principle of journalism is that reporters cannot offer opinions in public because it compromises the objectivity required in reporting.  He gave personal examples of his adherence to that principle, such as never allowing political signs in his yard and never signing petitions.   Kennedy explained these well-established principles are reflected in the Post-Gazette's Social Media Guidelines, which state that newsroom employees should not make public their personal opinions.

31.     Johnson asked if she was being disciplined and the editors told her that the purpose of their call was educational, not disciplinary.  The editors told Johnson they wanted to ensure she understood that the editorial decision was intended to protect the Post-Gazette's credibility as a news organization, her credibility as a reporter, and her safety in these particular circumstances.

32.     Johnson was dissatisfied with the explanation, claimed that she did not think the principles were consistently applied, and said that her voice as an African-American reporter was being censored.  Kennedy responded that the conversation was about journalistic credibility, not censorship.

33.     After the telephone conversation, Johnson e-mailed Kennedy, asking for a written recap of the conversation.  Kennedy replied by e-mail, attaching a copy of the Social Media Guidelines.

34.     Johnson was not disciplined.

35.     Johnson suffered no wage loss.

36.     Johnson suffered no other adverse economic consequences.

37.     Johnson maintained her position and title at the Post-Gazette.

38.     Johnson was not "pulled" from covering the George Floyd protests or otherwise reassigned because she was not previously assigned such work, given that her usual beat involved chronicling social media trends.

39.     On June 3, 2020, the Newspaper Guild of Pittsburgh, Local 38061 ("Guild"), the union representing Post-Gazette employees, filed a contractual grievance, claiming that the Post-Gazette's action with respect to Johnson was "discipline" not supported by just cause.  The Post-Gazette responded to that grievance on June 22, 2020, denying it and additionally pointing out that no discipline was involved, and that the management rights clause of the expired (but then still in force) collective bargaining agreement gives it the right to assign work in the newsroom.

40.     Also on June 3, 2020, at Kane's direction, Batiste, Assistant Managing Editor – sports, contacted Axelrod to reinforce the instruction that under the Social Media Guidelines, he

could not be assigned to protest coverage since he had injected his personal opinion into the public controversy by posting a clapping hands emoji in response to Johnson's tweet.

41.    As with Johnson, no discipline was imposed on Axelrod, nor was any adverse employment action taken.  Instead, he was told he would not be eligible to be assigned to coverage of the demonstrations because he had taken a public position on the events.  Also just like Johnson, this had no practical effect on his work at the Post-Gazette because he is a sports copy editor who would not normally be assigned to such coverage.

42.    On June 5, the Guild took steps to exploit the Johnson complaint and to manufacture "evidence" of discrimination.  The Guild's Executive Committee sent an email to its members urging them to repost the Johnson tweet on their own social media accounts.  The email included a copy of the tweet's text and associated images and gave specific instructions to cut and paste them to their own accounts with the hashtag #StandWithAlexis.  The Guild e-mail explained that the purpose of the request was intentionally to place the Post-Gazette in the untenable position of either foregoing all protest coverage or allowing such coverage by those who had engaged in improper social media commentary similar to that of Johnson.   In the Guild's own words: "Now what is management going to do?  Ban us all from coverage?  Or ignore our tweets – exactly what Alexis tweeted – thereby showing how they discriminate?"

43.    The Post-Gazette responded to the Guild's effort to manufacture evidence of differential treatment by neutrally applying the traditional rules of professional journalism and assigning protest coverage only to those who were not active on social media with respect to the protests.

44.     Even before these events, the Post-Gazette consistently followed the standard journalistic practice of not assigning reporters to cover stories or events about which they have taken a public position.

45.     The Post-Gazette also had to decide how to handle previously published stories written by reporters who actively disqualified themselves from protest coverage by participating in the Guild's scheme.  The journalistic concerns underlying the Social Media Guidelines were the same, regardless of whether Post-Gazette reporters' tweets came before or after the publication of a protest-related story.  In this connection, McDonough found that two stories on the Post-Gazette website were written by reporters who had reposted the Johnson tweet.  To avoid the perception of partiality, Kane re-edited the stories using independent sources to verify the content, removed the bylines, and reposted the stories to the Post-Gazette webpage.  This allowed the Post-Gazette to publish the news while remaining true to its editorial policy that reporters should not opine and report on the same subject.

46.     All Post-Gazette staff members who opted to follow the Guild's unethical strategy of taking a public position on matters covered by the paper were subject to the same rules.

47.     No staff members who followed the Guild's unethical strategy of reposting Johnson's tweet in order to undermine the Post-Gazette's journalistic integrity were subjected to any discipline or adverse employment action.

**E.     The Commission's Inquiry Intrudes on Editorial Decision-Making in Violation of the Post-Gazette's Constitutionally-Protected First Amendment Rights**

48.     On June 9, 2020, the Commission notified the Post-Gazette and BCI it had initiated a complaint of employment discrimination against them under Title VII of the Civil Rights Act of 1964, as amended, and the Pittsburgh City Code, Chapter 659.02, as amended.

49.     Specifically, the Complaint states that the Commission "finds a need to investigate" and "will investigate" allegations that the Post-Gazette "engaged in adverse treatment for their female and African American journalist" relating to Johnson's May 31 tweet and the Post-Gazette's editorial policies disallowing anyone who has injected their personal views into a public controversy from covering that issue.  The Complaint alleges that reporters did not get story assignments they requested, or had stories altered or deleted, and suggests that the Post-Gazette's editorial choices and assignment decisions designed to preserve editorial integrity constitute "discrimination" or "retaliation" in violation of local and federal law.  *See* Exhibit 1.

50.     PG Publishing Company and BCI answered the Complaint on July 16, 2020 ("Answer").  The Answer denied having engaged in any discriminatory practice relating to employment based upon or in the category of race discrimination or retaliation and affirmed that the Post-Gazette's actions towards its journalists have been based on non-discriminatory and non-retaliatory journalistic principles.  It further stated that the Commission's claims are barred by the Post-Gazette's First Amendment rights as a news publisher, which protects it from government interference in decisions about what shall be published and who shall report.  The PG Publishing Company and BCI's Answer to the Commission Complaint is attached hereto as Exhibit 4.

51.     On July 16, 2020, PG Publishing Company and BCI also submitted a position statement to the Commission in response to the Complaint.  The position statement and supporting exhibits make clear that the Post-Gazette simply applied established principles of professional journalism to avoid the appearance of partiality equally to all staff members, that there was no discrimination of any kind, and that no one was penalized in any way –

13

notwithstanding the Guild's unethical efforts to manufacture evidence of discrimination.  The position statement includes a detailed legal analysis showing that a newspaper's decision about what stories to cover, which reporters to assign, and how to edit those stories, are journalistic judgments protected by the First Amendment, and are thus not subject to the Commission's regulatory authority.  PG Publishing Company and BCI's position statement is attached hereto as Exhibit 5.

52.     In August 2020, counsel for PG Publishing Company and BCI scheduled a call with the Commission and its counsel to confer about the Complaint and to discuss the course of further PCHR proceedings.  On August 7, 2020, First Amendment counsel for PG Publishing Company and BCI sent a letter to counsel for the Commission explaining that, "as a matter of First Amendment law, the Commission lacks authority to question, investigate, or penalize a newspaper's editorial policies or practices."  The letter suggested the scheduled call should focus on that precise legal question and asked the Commission "to confirm, in writing, at the earliest possible time that it will take no further action that threatens to abridge the Post-Gazette's rights to freedom of the press under both the United States and Pennsylvania Constitutions."  The August 7, 2020 letter to counsel for the Commission is attached hereto as Exhibit 6.

53.     In response, the Commission's counsel cancelled the scheduled call with PG Publishing Company and BCI.  By letter of August 11, 2020, counsel for the Commission rejected the request to terminate the investigation, and instead, confirmed in writing that "the Commission will continue its investigation of this matter."  The August 11, 2020 Letter to Plaintiffs' counsel is attached hereto as Exhibit 7.

54.     The Commission's investigation extends to BCI as the parent company of the Post-Gazette even though BCI does not do business in Pennsylvania and is not the employer of

Post-Gazette employees.  The Commission thus seeks to exert regulatory authority over an entity that was never a proper subject of the Complaint.

55.     The Commission is a political body whose members are appointed by the mayor of Pittsburgh and confirmed by the Pittsburgh City Council.  Under the Commission's grant of authority, an investigation may include the issuance of subpoenas as well as discovery into the Post-Gazette's editorial decision-making process.  The Commission also has the authority under local ordinances to convene public hearings, subpoena witnesses, and compel testimony. Pittsburgh City Code, Chapter § 653.05(b)-(c).  If the Commission were to find the Post-Gazette's editorial policies and staff assignments constituted a violation, the Commission could require the Post-Gazette to cease and desist its editorial practices, provide monetary relief in the form of all actual damages, pay attorney fees, and take such affirmative or equitable actions as the Commission may direct.  Pittsburgh City Code, Chapter § 655.06(d).

56.     Requiring a newspaper to report to a political body to explain or justify its editorial decisions and staff assignments is precisely what the First Amendment was designed to prevent.  As the Supreme Court unanimously explained, protections for a free press have "no more certain antithesis" than to allow the government to intrude on such editorial decisions. *Hurley*, 515 U.S. at 579.  The United States and Pennsylvania Constitutions divest the government of any authority to investigate, dictate, or penalize a newspaper's editorial choices.  The journalistic decision about what stories to publish and which reporters should cover them are matters in which the government may not interfere.  The continuation of the Commission's inquiry into the Post-Gazette's editorial process thus constitutes an ongoing violation of the Plaintiffs' rights to freedom of the press.

15

## COUNT I

**(Violation of Plaintiffs' First Amendment Rights)**

57.     Plaintiffs incorporate by reference and reallege the foregoing factual allegations in paragraphs 1 through 56 as if fully set forth herein.

58.     The Commission's investigation of the Post-Gazette's editorial practices directly implicates Plaintiffs' First Amendment rights because it requires a newspaper to explain and justify its news judgments to a government agency.

59.     A newspaper need not await the imposition of sanctions by a government agency before it may challenge the inquiry as a violation of the First Amendment.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-60 (2014).

60.     The Commission has confirmed it intends to continue its investigation of the Post-Gazette for its editorial decisions after having received a comprehensive position statement, supported by exhibits, demonstrating that the Post-Gazette's assignment of reporters was done solely to protect the newspaper's editorial integrity under well-established canons of journalistic ethics.  The position statement also informed the Commission of case law holding that First Amendment prohibits the government from intruding on a newspaper's editorial decisions, even when the asserted interest involves anti-discrimination law.

61.     The First Amendment prohibits government investigations into a newspaper's editorial policies and decisions.  *Bursey v. United States*, 466 F.2d 1059, 1084-87 (9th Cir. 1972) ("Questions about the identity of persons who were responsible for the editorial content and distribution of a newspaper … cut deeply into press freedom.").  Nevertheless, the Commission has stated it intends to pursue an investigation of the Post-Gazette's editorial policies.  That investigation is authorized by ordinance to include the issuance of subpoenas, discovery, public hearings, and compelled testimony.  The Commission's investigation which will require the

Post-Gazette justify its editorial choices cannot be reconciled with constitutional protections for freedom of the press.

62.     The threat of sanctions for the exercise of editorial judgment violates the First Amendment.  The Post-Gazette has the sole authority to shape its editorial content, and may establish and enforce rules and guidelines designed to prevent its reporters from engaging in activities which may compromise their standing as responsible journalists, or the integrity of the newspaper.  Government intrusion into the "crucial process" of exercising editorial control and judgment is inconsistent with First Amendment guarantees of a free press.  *Tornillo*, 418 U.S. at 258.

63.     The Supreme Court has made clear that the choice of what goes into a newspaper constitutes "'the exercise of editorial control and judgment' upon which the State cannot intrude," despite even claims of discrimination in the exercise of that judgment.  *Hurley*, 515 U.S. at 575.  It has held that any compulsion for a newspaper "to publish that which 'reason' tells them should not be published is unconstitutional."  *Tornillo*, 418 U.S. at 256.  The protection for editorial control extends to staff assignments, because "the publisher's choice of writers affects the expressive content of its newspaper," and "the First Amendment protects that choice." *McDermott*, 593 F.3d at 962.

64.     The First Amendment also protects a newspaper's decision to adopt and follow codes of professional ethics, such as the Post-Gazette's Social Media Policy.  *Newspaper Guild of Greater Phila.*, 636 F.2d 550.  This is because "a news publication must be free to establish without interference, reasonable rules designed to prevent its employees from engaging in activities which may directly compromise their standing as responsible journalists and that of the publication for which they work as a medium of integrity."   *Id*. at 561 (internal footnotes

omitted). *See Nelson v. McClatchy Newspapers, Inc.*, 131 Wash.2d 523, 540 (Wash. 1997) (*en banc*) ("Editorial integrity and credibility are core objectives of editorial control and thus merit protection under the free press clauses.").

65.     The Commission investigation violates the First Amendment because it amounts to a state inquiry into the editorial processes and decision-making of the Post-Gazette, which is patently unconstitutional. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

## COUNT II

### (Violation of Plaintiffs' Rights Under Article I, § 7 of the Pennsylvania Constitution)

66.     Plaintiffs incorporate by reference and reallege the foregoing factual allegations in paragraphs 1 through 65 as if fully set forth herein.

67.     PCHR's investigation of the Post-Gazette's editorial practices directly implicates Plaintiffs' rights under Article I, § 7 of the Pennsylvania Constitution because it requires a newspaper to explain and justify its news judgments to a government agency.

68.     The Commission's investigation with its potential for sanctions violates the Pennsylvania Constitution for all of the reasons set forth above that it violates the First Amendment to the U.S. Constitution.

69.     State constitutional provisions protect the Post-Gazette's editorial decisions perhaps to an even greater degree than the federal Constitution. *See Sutton v. Chanceford Twp.*, 186 F. Supp. 3d 342, 350 (M.D. Pa. 2016) ("Article I, § 7 of the Pennsylvania Constitution affords greater protection to expressive conduct than the United States Constitution's First Amendment."); *Pa. Bur. of Prof'l & Occupational Affairs v. State Bd. of Physical Therapy*, 556 Pa. 268, 275 (Pa. 1999) ("Article I, § 7 of the Pennsylvania Constitution provides protection for freedom of expression that is broader than the federal constitutional guarantee.").

18

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and provide the following relief:

(a)     A declaration that the Commission's investigation violates the Plaintiffs' rights to freedom of the press under the First Amendment to the United States Constitution and Article I, § 7 of the Pennsylvania Constitution;

(b)     Preliminary and permanent injunctions enjoining the Commission from further action that threatens to abridge the Plaintiffs' rights to freedom of the press under the First Amendment to the United States Constitution and Article I, § 7 of the Pennsylvania Constitution;

(c)     Preliminary and permanent injunctions enjoining the Commission and ordering it to dismiss its Complaint and terminate its investigation;

(d)     An award to Plaintiffs of their reasonable costs and attorney's fees in this action pursuant to 42 U.S.C. § 1988; and

(e)     Such other and further relief in favor of Plaintiffs as may be just and proper.

Respectfully Submitted,

PG PUBLISHING COMPANY and
BLOCK COMMUNICATIONS, INC.

By their attorneys,

*/s/ Patrick K. Cavanaugh*
Patrick K. Cavanaugh
PA ID 72960
Zachary N. Gordon
PA ID 318808
**DEL SOLE CAVANAUGH STROYD LLC**
Three PPG Place, Suite 600
Pittsburgh, PA 15222
412-261-2395 (phone)
pcavanaugh@dscslaw.com

Robert Corn-Revere (*pro hac vice* forthcoming)
Ronald London (*pro hac vice* forthcoming)
Courtney T. DeThomas (*pro hac vice* forthcoming)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington D.C. 20005
202-973-4200
bobcornrevere@dwt.com
ronnielondon@dwt.com
courtneydethomas@dwt.com

Dated: August 18, 2020